# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ALLEN L. MOORE, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 06 C 6088 |
| THOMAS MONAHAN, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On May 14, 2008, Plaintiff Allen L. Moore, through appointed counsel, filed a three-count Amended Complaint alleging an excessive force claim (Count I), a denial of adequate medical care claim (Count II), and a conditions of confinement claim (Count III) against certain employees of the Illinois Department of Human Services Treatment and Detention Facility. *See* 42 U.S.C. § 1983. Defendants Thomas Monahan, Darrell Sanders, Tarry Williams, Bernard M. Akpan, and Tammy Chasteen filed the present Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants Defendants' partial summary judgment motion and denies Defendants' motion to strike as moot. The only remaining claim in this lawsuit is Moore's excessive force claim as alleged in Count I of the Amended Complaint against Defendants Sanders, Graham, Williams, Cleveland, Hogan, Humphrey, and Burnette.

## BACKGROUND

### I.     Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts

from the parties' Local Rule 56.1 statements. Specifically, Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004). Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.,* 403 F.3d 940, 944 (7th Cir. 2005). In addition, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008). In short, the nonmoving party must set forth its material facts in a separate statement – not in its Local Rule 56.1(b)(3) responses to the moving party's statement of facts. *See id.* at 643 ("court does not abuse its discretion when it opts to disregard facts presented in a manner that does follow the Rule's instructions").

The purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006). A litigant's failure to respond to a Local Rule 56.1 statement results in the Court admitting the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."

*Bordelon,* 233 F.3d at 528. Moreover, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., L.L.C.* 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed"). With these standards in mind, the Court turns to the relevant facts of this case.

## II. Relevant Facts

Moore is in the custody of the Illinois Department of Human Services ("DHS") on parole from the Department of Corrections ("IDOC") awaiting the determination of his civil commitment under the Illinois Sexually Violent Persons Commitment Act ("SVP Act"), 725 ILCS 207/1, *et seq.* (R. 185-1, Defs.' Rule 56.1 Stmt. Facts ¶ 1.) From July 12, 2005 until December 27, 2005, Moore resided at the DHS Treatment and Detention Center ("TDF") in Joliet, Illinois and currently resides at the TDF in Rushville, Illinois. (*Id.* ¶ 2.) On November 7, 2006, Moore filed a pro se Complaint and on January 10, 2008, the Court granted in part and denied in part Defendants' motions to dismiss. (R. 1-1, Compl.; R. 130-1, Mem., Op. and Order.) Shortly thereafter, the Court granted Moore's motion for appointment of counsel. (R. 133-1.) On May 14, 2008, Moore, by counsel, filed an Amended Complaint. (R. 149-1.) On December 22, 2008, Defendants filed the present partial summary judgment motion. (R. 183-1.)

From September 2005 until March 2007, Monahan was the Acting Director of the TDF. (Defs.' Stmt. Facts ¶ 3.) From January 2004 until September 2007, Sanders was TDF's Director of Security. (*Id.* ¶ 4.) Also during the relevant time period, Williams was an Internal Investigator at the TDF, who was temporarily assigned as an Executive II, and both Akpan and

Graham were Executive II at the Joliet TDF. (*Id.* ¶¶ 5, 6, 7.) Timothy Burnette, Tony Humphrey, and Leslie Hogan were Security Therapist Aides ("STA") II at the Joliet TDF. (*Id.* ¶¶ 8 10, 11.) Meanwhile, Chasteen and Defendant Shawndo Cleveland were STAs. (*Id.* ¶¶ 9, 12.)

On December 19, 2005, Emergency Response Team ("ERT") staff removed Moore from his room on the A wing of the Joliet TDF. (*Id.* ¶ 19.) At 3:30 p.m. that same day, ERT staff took Moore to the Health Care Unit ("HCU") of the Joliet TDF due to a cut on his face and abrasions. (*Id*. ¶ 20.) At that time, Moore's blood pressure was 153/82. (R. 192-1, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶ 66.) After they treated him for his cuts and abrasions, which was around 3:50 p.m, Moore, who was accompanied by STAs, walked to the observation room on the A wing of the Joliet TDF. (Defs.' Stmt. Facts ¶ 22.) While in the observation room, Moore maintains that he asked Chasteen for assistance because of his dizziness and pain to no avail. (Pl.'s Stmt. Facts ¶ 68.) By 5:50 p.m., Moore's blood pressure had risen to 156/88. (*Id.* ¶ 66.) Thereafter, STA Kenneth Tyler observed Moore slide to the floor in the observation room. (*Id*. ¶ 69; Defs.' Stmt. Facts ¶ 23.) Two nurses from the HCU staff then arrived in the A wing, as well as Akpan and Williams. (Defs.' Stmt. Facts ¶¶ 27, 29.) The nurses determined that Moore needed to go back to the HCU, after which one nurse and DHS staff members placed Moore in a wheelchair and took him to the HCU where staff provided medical treatment. (*Id.* ¶¶ 32, 33.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

4

matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quoting Fed.R.Civ.P. 56(e)).

## ANALYSIS

**I.     Excessive Force Claim – Count I**

In Count I of his Amended Complaint, Moore alleges an excessive force claim against Defendants Monahan, Sanders, Graham, Williams, Akpan, Cleveland, Hogan, Humphrey, and Burnette for allegedly attacking him when they removed him from his room on December 19, 2005. In the present partial summary judgment motion, Monahan and Akpan maintain that because they did not have personal involvement in the attack, they cannot be liable under Section 1983. Indeed, as the Seventh Circuit instructs, "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996); *see also Grieveson v. Anderson,* 538 F.3d 763, 776 (7th Cir. 2008) ("A plaintiff bringing a civil rights action must prove that the defendant personally participated in or

5

caused the unconstitutional actions.") (citations omitted). Because it is undisputed that Akpan did not participate in or direct the removal of Moore from his room on December 19, 2005, the Court dismisses Akpan as a Defendant from Count I of the Amended Complaint. (Defs.' Stmt. Facts ¶ 14.)

Meanwhile, although Monahan was not present at Moore's removal on December 19, 2005, Moore maintains that Monahan is liable as a supervisor. *See Steidl v. Fermon,* 494 F.3d 623, 631-32 (7th Cir. 2007). It is well-established that supervisors may be liable when their subordinates violate a person's constitutional rights if the supervisors "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.* (quoting *Jones v. Chicago,* 856 F.2d 985, 992-93 (7th Cir. 1988)); *see also Nanda v. Moss,* 412 F.3d 836, 842 (7th Cir. 2005) ("supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent."). A supervisor, however, cannot be liable in a Section 1983 action under the theory of respondeat superior. *See Kinslow v. Pullara,* 538 F.3d 687, 692 (7th Cir. 2008) (agency principles do not apply to claims under Section 1983).

Here, Moore fails to present any evidence that Monahan knew of the other Defendants' alleged misconduct and condoned, approved, or ignored it. As such, viewing the facts and all reasonable inferences in Moore's favor, he has failed to set forth sufficient evidence raising a genuine issue of material fact for trial that Monahan knew of or was recklessly indifferent to his subordinates' alleged misconduct. *See Steidl,* 494 F.3d at 632; *Johnson v. Snyder,* 444 F.3d 579, 584 (7th Cir. 2006). Therefore, the Court dismisses Monahan and Akpan as Defendants from

Count I of the Amended Complaint.

## II.     Denial of Adequate Medical Care – Count II

In Count II of his Amended Complaint, Moore alleges that Monahan, Sanders, Chasteen, Williams, Akpan, and Thompson[1] denied him adequate medical care. Civilly-committed detainees are protected by the Due Process Clause of the Fourteenth Amendment and "their protection against cruel and inhumane treatment has been defined as at least as extensive as that afforded to prisoners by the Eighth Amendment." *Sain v. Wood,* 512 F.3d 886, 893 (7th Cir. 2008); *see also Brown v. Budz,* 398 F.3d 904, 909 (7th Cir. 2006). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." *Williams v. Liefer,* 491 F.3d 710, 714 (7th Cir. 2007) (citing *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The test for the deliberate indifference to serious medical needs has both an objective and subjective element. *See Edwards v. Snyder,* 478 F.3d 827, 830 (7th Cir. 2007) (*Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Specifically, Moore must demonstrate: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that medical condition. *See Hayes v. Snyder,* 546 F.3d 516, 522 (7th Cir. 2008); *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008). "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention."

---

[1] Moore never served Nathaniel Thompson with his complaint and summons, *see* Fed.R.Civ.P. 4(c)(1), nor has Moore presented evidence that Thompson was involved in any deprivation of his constitutional rights. *See Levy v. Pappas,* 510 F.3d 755, 763 (7th Cir. 2007) ("In a § 1983 action, liability cannot attach against an individual defendant unless 'the individual defendant caused or participated in a constitutional deprivation.'") (citation omitted). Therefore, the Court dismisses Thompson as a Defendant from this action.

*Hayes*, 546 F.3d at 522; *see also Lee v. Young,* 533 F.3d 505, 509 (7th Cir. 2008). To satisfy the subjective element, "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Hayes*, 546 F.3d at 522.

As the record reveals, immediately after Moore was removed from his room on December 19, 2005, he was taken to the HCU and treated for cuts and abrasions. At that time, Moore's blood pressure was 153/82. After he was treated at the HCU – around 3:50 p.m – Moore, who was accompanied by STAs, walked to the observation room on the A wing of the Joliet TDF. Moore maintains that he asked Chasteen for medical assistance because he was dizzy and in pain and that she responded that he looked fine to her. By 5:50 p.m., Moore's blood pressure had risen to 156/88. After Moore slid to the floor in the observation room, two nurses from the HCU staff arrived in the A wing, as well as Akpan and Williams. The nurses determined that Moore needed to go back to the HCU after which one nurse and DHS staff members placed Moore in a wheelchair and took him to the HCU where he received medical treatment.

Defendants do not deny that Moore demonstrated a sufficiently serious medical need at the time he collapsed on the floor of the observation room. Instead, Defendants maintain that once Moore collapsed, STAs responded to his medical need without delay, including STA Tyler immediately contacting the HCU after the collapse and HCU nurses treating Moore. Moore, however, argues that he was in the observation room for an hour before the nurses arrived, and thus Defendants were deliberately indifferent to his medical condition. *See Hayes*, 546 F.3d at 522. Moore also argues that he complained about dizziness and pain since around 3:30 p.m. that same day. Assuming that there was a delay of two to three hours, Moore has failed to present

any evidence – medical or otherwise – to confirm or corroborate that the delay was detrimental, namely, that it caused some degree of harm. *See Williams v. Liefer,* 491 F.3d 710, 714-15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm."). Without more, Moore has failed to raise a genuine issue of material fact for trial concerning the alleged delay of medical treatment.

Moore also argues that Security Therapist Aid Chasteen and other TDF staff were deliberately indifferent to his medical needs when he complained that he was dizzy and in pain prior to his collapse. Moore, however, does not point to any evidence in his Local Rule 56.1(b)(3)(C) Statement of Additional Facts that Monahan, Sanders, Chasteen, Williams, or Akpan knew he had high blood pressure prior to his collapse or any other details about his physical complaints and conditions. In fact, it is undisputed that Sanders and Monahan had no involvement whatsoever in the alleged denial of medical attention. (*See* Defs' Stmt. Facts ¶¶ 15, 16, 18.) Meanwhile, when Moore complained to Chasteen of dizziness and pain, he had just been released by medical personnel in the HCU and there is no evidence that he had symptoms at that time that would have demonstrated to a lay person – such as Chasteen – that he needed additional medical attention. In other words, Moore has failed to present sufficient evidence that his medical condition was "so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes*, 546 F.3d at 522. Viewing the facts and reasonable inferences in Moore's favor, he has failed to present sufficient material evidence creating a genuine issue of material fact for trial that Defendants were deliberately indifferent to his medical needs. The

Court thus grants Defendants' summary judgment motion as to Count II of the Amended Complaint.

III. **Conditions of Confinement Claim – Count III**

In Count III of the Amended Complaint, Moore alleges that the conditions of his confinement at the Joliet TDF were inhumane. Specifically, Moore maintains that the A and B wings at the Joliet TDF had extreme temperatures in summer and winter and that his room was infested with insects. The Fourteenth Amendment requires that Moore "be housed under 'humane conditions'" and provided with 'adequate food, clothing, shelter, and medical care.'" *Sain,* 512 F.3d at 893-94 (quoting *Farmer,* 511 U.S. at 832). To establish a conditions of confinement claim, Moore must present evidence that (1) he suffered a sufficiently serious constitutional deprivation; and (2) Defendants acted with deliberate indifference to the conditions of his confinement. *See id.* at 894 (citing *Farmer*, 511 U.S. at 837). In short, if an "inmate successfully establishes that the conditions were sufficiently serious, [the Court] then examine[s] whether prison officials acted with 'deliberate indifference' to the conditions in question." *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008).

A. **Temperature**

First, Moore maintains that the temperature controls of units A and B at the Joliet TDF were inadequate leading to excessive heat in the summer and excessive cold in the winter. As the Seventh Circuit teaches, "[p]rison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon v. Godinez,* 114 F.3d 640, 642 (7th Cir. 1997) (citing *Farmer,* 511 U.S. at 833-34). "Prisoners are, however, entitled to 'the minimal civilized measure of life's necessities,' including adequate

10

shelter. For this reason, prisoners have a right to protection from extreme cold." *See Dixon,* 114 F.3d at 642 (citation omitted). Prisoners also have a right to be protected from extreme heat. *See Jones-El v. Berge,* 374 F.3d 541, 543 (7th Cir. 2004). To determine whether extreme heat or cold amount to a serious constitutional deprivation, courts look to various factors, including the severity of the cold or heat, its duration, whether the prisoner has alternative means to protect himself, and whether the prisoner must endure other uncomfortable or harsh conditions. *See Dixon,* 114 F.3d at 644. In *Dixon*, for example, the prisoner established that the temperature in his cell – during the day and night – averaged around 40 degrees Fahrenheit and often fell below freezing during the four winters he was incarcerated. *Id.* at 643-44; *see also Del Raine v. Williford,* 32 F.3d 1024, 1035 (7th Cir. 1994) (temperature in cell not much higher than temperature outside, which was forty degrees below zero with wind chill.)

Here, evidence in the record includes daily temperature logs from units A and B, which reveal that on one occasion the units were around 90 degrees Fahrenheit. (Pl.'s Stmt. Facts ¶ 74.) It also appears the A and B units were routinely ten to fifteen degrees warmer than the other units, although many of the temperature logs are incomplete or missing. (*Id.* ¶¶ 74, 75.) Meanwhile, a member of the maintenance staff who took daily temperature readings did not recall the temperature being below 60 degrees Fahrenheit in the cold months of 2005. (Defs.' Stmt. Facts ¶ 54.) Also, each resident's room in the A and B wings had a radiator to provide radiant heat and although DHS only issued Moore one blanket, he had his own extra blankets, a coat, a jacket, winter gloves, slippers, a cap, and a fan in his room. (*Id.* ¶¶ 57, 61; Pl.'s Stmt. Facts ¶ 78.) Moore also applied plastic sheeting to the window in his room to protect himself from the cold. (Pl.'s Stmt. Facts ¶ 79.)

Unlike the prisoner in *Dixon*, not only did Moore have alternative means to protect himself from the cold and heat – such as extra blankets and a fan – but the evidence reveals that the heat and cold were not that extreme and that Moore was a detainee at Joliet TDF for only a few months in duration. Meanwhile, evidence in the record shows that there was only one day where the heat was extreme. *See Perez v. Sullivan,* 100 Fed.Appx. 564, 567, 2004 WL 1245299, at *2 (7th Cir. 2004) (isolated incident failed to demonstrate that defendants disregarded risk to prisoner's health). Furthermore, as discussed in detail below, Moore has not presented evidence in his Local Rule 56.1(b)(3)(C) Statement of Additional Facts that he had to endure other harsh or uncomfortable factors, such as a lack of food, defective plumbing, or prolonged pest infestation. *See Dixon,* 114 F.3d at 643; *see also Gillis v. Litscher,* 468 F.3d 488, 493 (7th Cir. 2006) (lack of heat, clothing, sanitation, food can violate Eighth Amendment).

In addition, there is evidence in the record that it was TDF Joliet's policy and practice for the maintenance staff to take daily temperature readings. (Defs.' Stmt. Facts ¶ 51.) If the weather was warm, the maintenance staff would use exhaust fans in the A and B wings. (*Id.* ¶ 55.) The staff further provided TDF residents with access to an ice machine and allowed them to take ice to their rooms. (*Id.* ¶ 56.) In addition, Moore was allowed to leave his room without restrictions during appropriate hours and could go to the day room, the yard, and the weight room. (*Id.* ¶ 63.) Based on the Joliet TDF's rules and practices, Moore has not established that Defendants acted with deliberate indifference to the heat and cold in units A and B. In other words, Defendants did not disregard any excessive risks to Moore's health or safety because they took reasonable measures to abate the cold and heat. *See Farmer,* 511 U.S. at 837; *Dale v. Piston,* 548 F.3d 563, 568 (7th Cir. 2008).

## B. Insect Infestation

Next, Moore argues that while he "was not stung or bitten by the insects that infested the treatment center and flew in through his window, he was required to spend his nights for a number of months capturing and killing stinging insects to prevent such an injury." (R. 191-1, Pl.'s Resp. Brief, at 7.) As such, "the need to prevent injury from the insects caused Plaintiff to suffer sleeplessness." (*Id.*) The Seventh Circuit has held "that a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a due process violation." *Sain,* 512 F.3d at 894 (citing *Antonelli v. Sheahan,* 81 F.3d 1422, 1431 (7th Cir. 1996)). In *Antonelli,* the Seventh Circuit emphasized that "'the allegation of sixteen months of infestation and significant physical harm' distinguished his case from the typical pest-infestation complaint." *Sain,* 512 F.3d at 894 (quoting *Antonelli*, 81 F.3d at 1431).

Moore's allegations do not come close to reaching the *Antonelli* level of pest infestation. Specifically, he was at the Joliet TDF for five and a half months during which he was never stung or bitten by an insect. Instead, he experienced sleeplessness because he stayed up at night to kill insects. Under these circumstances, the Court would be hard-pressed to conclude that Moore suffered significant physical harm due to prolonged pest infestation. *See Antonelli,* 81 F.3d at 1431. Put differently, Moore's complaints of pest infestation do not constitute an objectively serious constitutional deprivation. *See Sain,* 512 F.3d at 894. Even if Moore's allegations of pest infestation amounted to an objectively serious constitutional deprivation, the undisputed evidence that an extermination service sprayed for pests at least twice a month at the Joliet TDF belies the conclusion that Defendants were deliberately indifferent to Moore's

conditions of confinement regarding pest infestation. *See, e.g., Stanley v. Page,* 44 Fed.Appx. 13, 16, 2002 WL 1940159, at *2 (7th Cir. Aug. 20, 2002); *Killen v. McBride,* 70 F.3d 1274, 1995 WL 687626, at *3 (7th Cir. Nov. 14, 1995). Therefore, Moore's pest infestation claim fails.

Construing the evidence and all reasonable inferences in a light most favorable to Moore, he has failed to set forth sufficient evidence raising a genuine issue of material fact for trial concerning his conditions of his confinement claim. The Court thereby grants Defendants' summary judgment motion as to Count III of the Amended Complaint.

## IV. Qualified Immunity

Because Moore has failed to raise a genuine issue of material fact for trial that Defendants violated his constitutional rights under Counts II and III of the Amended Complaint, the Court need not address Defendants' qualified immunity arguments as to these claims. *See Williams v. Rodriguez,* 509 F.3d 392, 398 (7th Cir. 2007).

### CONCLUSION

For the reasons, the Court grants Defendants' Partial Summary Judgment Motion and denies Defendants' Motion to Strike as Moot.

**Dated:** February 9, 2009

                              **ENTERED**

                              _____
                              **AMY J. ST. EVE**
                              **United States District Court Judge**